## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| iQUARTIC, INC.,           ) | |
|        Plaintiff,    ) | |
|          ) | |
| v.          ) | CIVIL ACTION NO. |
|          ) | |
| W. BARRETT SIMMS,     ) | |
|        Defendant.   ) | |
|          ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

The plaintiff, iQuartic, Inc. ("iQuartic"), hereby submits this action and its Application

for Temporary Restraining Order and Motion for Preliminary Injunction.  This action is

commenced pursuant to, *inter alia*, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et. seq

("CFAA"), and attendant state-law claims, including alleged violations of M.G.L. c. 93, §42, et.

seq, and M.G.L. c.  93A, §11, for misappropriation of trade secret information, against the

defendant W. Barrett Simms (the "Defendant"), in connection with iQuartic's proprietary and

trade secret software code and Defendant's unauthorized access and use of information on

iQuartic's network computer system and website.  iQuartic seeks emergency injunctive relief

pursuant to the CFAA and M.G.L. c. 93A that enjoins and/or restrains  the Defendant to:

    (a)    hold and maintain the status quo regarding all electronically stored information
("ESI") or documents in his possession, custody and control, including any
iQuartic ESI;

    (b)    immediately surrender and produce of all of his personal computers, as well as all
of his tablets or other personal electronic devices, including smart phones, for
immediate review, copying and imaging by iQuartic's computer forensics expert
to itemize all iQuartic ESI stored in Defendant's computers and electronic devices
and verify that Defendant has not transferred and/or improperly retained any

software code work product or other proprietary, trade secret and/or confidential information belonging to iQuartic;

(c)     authorize iQuartic's forensic expert to erase any such itemized proprietary, trade secret,  and/or confidential information and materials belonging to the iQuartic found on his electronic device(s) in accord with Defendant's contractual agreements with iQuartic; and

(d)     participate in an immediate exit interview in accord with Defendant's contractual agreements with iQuartic, whereby Defendant transfers the documented knowledge and/or associated information to iQuartic's software engineers, necessary to utilize the software code work product that Defendant was paid to develop while at iQuartic on behalf of iQuartic (collectively, the "Code"), including, but not limited to, all information regarding the design, use, operation and testing of the Code.

iQuartic requests this relief in order to prevent iQuartic from immediate and irreparable harm until the merits  of iQuartic's claims can be adjudicated upon a full hearing on the merits  for permanent injunctive relief and money damages.

## THE PARTIES

1.      The Plaintiff, iQuartic, is a Delaware corporation with its principal place of business at 745 Atlantic Avenue, 8th Floor, Boston, Massachusetts 02210.

2.      The Defendant Wm. Barrett Simms ("Defendant") is an individual residing in Plymouth, Plymouth County, Massachusetts.  The Defendant was formerly employed as iQuartic's Director of Engineering.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the Defendant's acts constitute violations of Federal law, including the Computer Fraud And Abuse Act, 18 U.S.C. § 1030 *et seq*. Supplemental Jurisdiction is also invoked pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this court pursuant to 29 U.S.C. § 1391(b), because the acts complained of occurred in this jurisdictional district and division.  iQuartic's principal place of

business is located in Massachusetts.  iQuartic's computers and proprietary information to which

the Defendant gained unauthorized access are also located in Massachusetts.  Finally, the

Defendant is a former iQuartic employee and undertook all or much of the complained of

conduct in Massachusetts.

## FACTUAL ALLEGATIONS

### *The Company*

5.     iQuartic is a health information technology start-up that designs and develops

state of the art technical and software solutions for medical providers, health insurance

companies, and state and federal government users.

6.     iQuartic was founded in 2012 and has won numerous healthcare information

technology accolades, both in Massachusetts and elsewhere, including: a.) participation in a

three-month "accelerator" program in 2012 for entrepreneurs working on new products and

services for the healthcare industry sponsored by Blue Cross Blue Shield of Massachusetts and

Healthbox; and b.)  participation in the New York Digital Health Accelerator sponsored by the

State of New York, nonprofit New York e-Health Collaborative ("NYeC"), and the Partnership

Fund for New York City.

7.     iQuartic successfully raised an initial funding round in late 2014 and is now in the

process of raising additional investment from both local and national investors.  In addition,

iQuartic is actively negotiating contracts for significant revenue with leading local and national

healthcare providers and health insurance companies.

Following its initial funding and as part of its continuing growth strategy, iQuartic began

a search for a full-time Software Developer to perform the following:

- Extract data from a variety of data sources, transform data, and load it into data
  warehouses and marts;

- Profile data for data quality; and develop and implement cleansing rules and approaches;

- Create, manage and support SQL Server DBMS in both development and production environment; and

- Write and optimize stored procedures.

*Defendant's Employment Agreements*

8.     On October 2, 2014, Defendant executed an Employment Agreement with iQuartic for the position of Director of Engineering.  A copy of the *Employment Agreement* is attached hereto as **Exhibit A**.

9.     In his role as Director of Engineering, the Defendant was tasked with working together with iQuartic' s officers, employees and its team of independent contractors, to produce the Code to be incorporated into a vital  pilot product for delivery to a new client.

10.     By Defendant's signature on the Employment Agreement, Defendant indicated that he read, understood and agreed to all of the provisions set forth therein.  In particular, by signing the Employment Agreement, Defendant acknowledged that his employment by iQuartic would be fulltime and that he would be required:

> not to engage in any other business or private services to any other business either as an employee, officer, director, agent, contractor or consultant, except with the express written consent of Company.  You will hold in a fiduciary capacity for the benefit of Company all information with respect to Company finances, sales, profits and other proprietary and confidential information acquired by you during your employment.

11.     Furthermore, Defendant acknowledged that:

> Upon the termination of your employment with the Company and prior to your departure from the Company, you agree to submit to an exit interview for the purposes of reviewing this letter agreement, the enclosed Proprietary Information Agreement and the trade secrets of the Company, and surrendering to the Company all proprietary or confidential information and articles belonging to the Company.

4

2248896.1

12.     iQuartic also required that Defendant execute its Confidentiality, Non-Solicitation, Work for Hire and Non-Competition Agreement ("Confidentiality Agreement") on October 2, 2014.  A copy of the *Confidentiality Agreement* is attached hereto as **Exhibit B**.

13.     The Confidentiality Agreement provided, in pertinent part, the following provisions with respect to "Confidentiality, Disclosure of Information," "Confidential Information," and "Company Material" :

**Confidentiality, Disclosure of Information**

(a) Employee / Consultant recognizes and acknowledges that Employee / Consultant will have access to Confidential Information and Company Materials (each as defined below) relating to the business and/or interests of the Company or of persons or entities with whom the Company may have, or will have, business relationships. Except as permitted herein, Employee / Consultant will not, while rendering service to the Company or at any time thereafter, use, disclose or permit to be known by any other person or entity, any Confidential Information of the Company (except as required by applicable law or as strictly necessary in connection with, and as contemplated in the ordinary course of, the performance of Employee / Consultant's duties and responsibilities for the Company).

The term "**Confidential Information**" means information relating to the Company's business affairs, proprietary technology, trade secrets, research and development data, know-how, business, market and marketing studies, plans, processes, data and forecasts, competitive analyses, pricing policies, Employee / Consultant lists, employment agreements (other than this Agreement), personnel policies, the substance of agreements with customers, suppliers and others, marketing arrangements, customer lists (including Employee / Consultant's rolodex and other personal files), customer data, commercial arrangements or any other information relating to the Company's business that is not generally known to the public or to actual or potential competitors of the Company (other than through a breach of this Agreement). Employee / Consultant's obligations under this Agreement shall continue until such Confidential Information becomes publicly available, other than pursuant to a breach of this Section 1 by Employee / Consultant, regardless of whether Employee / Consultant continues to render services to the Company.

5

(b) The term "Company Materials," includes, but are not limited to, computers, computer software, computer disks, tapes, printouts, source, HTML and other code, domain names, URLs, blogs, blog content, author pseudo-names, flowcharts, schematics, designs, graphics, drawings, photographs, charts, graphs, notebooks, customer lists, sound recordings, other tangible or intangible manifestation of content, and all other documents whether printed, typewritten, handwritten, electronic, digital or stored on computer disks, tapes, hard drives, or servers, or any other tangible medium, as well as samples, prototypes, models, products and the like. Company Materials are and shall be at all times the sole and exclusive property of the Company, and the Company reserves all ownership rights to, and licensing interests in, the Confidential Information, Company Materials and any other information disclosed to Employee / Consultant during the course of his/her employment with the Company.

Employee / Consultant's relationship with the Company shall not be deemed to grant or convey to Employee / Consultant any right, title or interest in or to any patent, trademark, license, copyright or other right of the Company to the Confidential Information, Company Materials or any other information disclosed to Employee / Consultant. Within forty-eight (48) hours of the termination of Employee/Consultant's employment with the Company, and/or forty-eight (48) hours of the Company's request, all confidential information, Company Materials and any other information disclosed to Employee/Consultant during the course of his/her employment with the Company, included copies thereof, as well as other Company property [in the possession of the Employee/Consultant] shall be returned to the Company and completely and permanently purged from Employee/Consultant's personal or other files (in any medium in which they may be stored)."

14.     The Confidentiality Agreement further provided, in pertinent part, the following

with respect to "Non-Competition and Non-Solicitation" and "Work for Hire" provisions:

2. **Non-Competition and Non-Solicitation**…Employee / Consultant acknowledges and agrees that any and all "goodwill" associated with any existing or prospective customer, account or business partner belongs exclusively to the Company including, but not limited to, any goodwill created as a result of direct or indirect contacts or relationships between Employee / Consultant and any existing or prospective customers, accounts or business partners.

…

Employee / Consultant further covenants and agrees that during the period while Employee / Consultant performs services for the Company and for a period of one (1) year…

…

(b) thereafter, Employee / Consultant may not directly or indirectly entice, solicit or encourage any customer, prospective customer, vendor, strategic partner or business associate of the Company to cease doing business with the Company, or to do business with Employee / Consultant or any other person or entity except on behalf of the Company, or to reduce its relationship with the Company or refrain from establishing or expanding a relationship with the Company.

3. **Work-for-Hire**

(a) Employee / Consultant acknowledges and agrees that: (i) all right, title and interest in and to any and all writings, documents, inventions, discoveries, ideas, blogs, blog content, domain names, URLs, author pseudo-names, developments, information, computer programs or instructions (whether in source code, object code, or any other form), algorithms, formulae, plans, memoranda, tests, research, designs, innovations, systems, programs, analyses, specifications, models, data, diagrams, flow charts, and/or techniques (whether patentable or non-patentable, and whether reduced to written or electronic form or otherwise) that Employee Consultant creates, makes, conceives, discovers or develops, either solely or jointly with any other person, at any time during employment, whether or not in the scope of employment (collectively, "Intellectual Work Product") shall be considered a "work for hire" as defined under the Copyright Act of 1976, as amended; and (ii) all the Intellectual Work Product was and/or shall be (as applicable) developed for the sole and exclusive use of and ownership by the Company.

…

(b) Employee Consultant's obligations under this paragraph will continue beyond the termination of the employment relationship with the Company, provided that the Company will compensate Employee / Consultant at a reasonable rate after such termination for time and/or expenses actually spent by Employee / Consultant at the Company's request on such assistance.

15.     Finally, the Confidentiality Agreement provided, in pertinent part, the following with respect to "Provisions Necessary and Reasonable":

2248896.1

…Employee / Consultant agrees that in the event of a breach or threatened breach of any of these covenants, in addition to attorneys' fees and court costs the Company shall be entitled to: (i) specific performance, and/or temporary, preliminary or permanent injunctive relief, without the requirement to post a bond or security; and/or (ii) any other remedies that the Company may have at law or in equity. Without limiting the generality of the foregoing, the seeking of such injunction or order shall not affect the Company's right to seek and obtain damages or other equitable relief on account of any such actual or threatened breach.

16.     Notably, Defendant's obligations under both of these agreements survive and extend beyond his date of resignation or termination from the company.

*iQuartic's Blue Cross Blue Shield Project*

17.     iQuartic's first major engagement of its software, EHRProfiler™, is with two of its investors, Blue Cross Blue Shield MA and Blue Cross Ventures/Association (collectively, "BCBS").

18.     In mid-2014, following a number of meetings with relevant stakeholders, iQuartic was invited by BCBS to generate a pilot product (the "Project").

19.     The internal deadline for delivery of the pilot product is November 2015.  It is essential to iQuartic that it successfully deliver on the project for BCBS on time, and that the EHRProfiler™ work as represented to BCBS and other customer prospects.

20.     Failure to deliver a properly working product on time to BCBS, will severely damage iQuartic's reputation and good will in the marketplace, as BCBS is a very high-profile customer and many customer prospects are aware of and watching iQuartic's performance on the Project with BCBS.

21.     Defendant was hired specifically to translate iQuartic's concept for the pilot product into software code (the "Code") for the November 2015 deadline.  The process of building the Code began when the Defendant began work at iQuartic.

8

*Defendant's Performance Issues*

22.      Within a few months of the Defendant joining iQuartic, his superiors at the company began to note problems with his work performance, which included, but were not limited to, an erratic working schedule, a decline in productivity and performance as early as last winter, and chronic absenteeism and/or unauthorized trips away from the office.

23.      Beginning in and around February of 2015, and continuing through the last several months of his employment at iQuartic, Mr. Simms became increasingly argumentative, uncooperative and oppositional.

24.      He also began to refuse to come into the office on a regular basis and, instead, demanded that he work from home.  The Defendant's colleagues also observed these behaviors and reported them to his superiors.

25.      In response to the Defendant's record of poor performance, iQuartic's Chief Executive Officer and Founder, Ze Jiang, met with the Defendant on May 18, 2015, and again on May 20, 2015, to request that Defendant produce the Code that he was hired to develop so that it could be deployed and tested internally.

26.      The purpose of the internal deployment and testing was to vet the Code so that the Defendant and the other iQuartic software engineers could ultimately incorporate the Code into the pilot product deliverable to BCBS.

27.      Both prior to and during these meetings, the Defendant became extremely agitated and defensive upon hearing this request and was physically shaking.  He also appeared to be upset, nervous and tense.  During the meeting, the Defendant avoided making eye contact with Mr. Jiang, had difficulty speaking in complete sentences and vehemently opposed testing the

software. He initially delayed, and ultimately refused to comply with Mr. Jiang's instructions to produce all of the Code.

28.     Defendant also stated that iQuartic had no right to test the software he had been paid to develop and that Mr. Jiang and other iQuartic personnel "weren't professionals."

29.     The Defendant further stated for the first time—contrary to his statements and forecasts that the software he was developing could be completed by the end of 2015—the software that he developed was in fact only 2% complete and would take an additional two years to complete.

30.     Immediately following the May 20, 2015 meeting, the Defendant left work and went home. The following day, the Defendant did not return to the office. Instead, the Defendant called Mr. Jiang from home and stated that he intended to resign from his position at iQuartic at the end of the last week of June (*i.e.*, June 26, 2015).

31.     Mr. Jiang interpreted the totality of the Defendant's behavior and conduct surrounding the course of his meetings with the Defendant about the deployment and testing of the Defendant's software to be indicative of significant problems with the software.

32.     After his verbal resignation on May 21, 2015, Defendant began to work almost exclusively from home and did not seem do much, if any, actual work. His behavior subsequently became even more erratic and his work performance and interaction with others at iQuartic further degraded.

33.     Shortly thereafter, Mr. Jiang hired another software developer, Sean Leary, to replace the Defendant; however, the Defendant refused to cooperate with Mr. Leary and failed to provide any significant knowledge transfer about his software to iQuartic.

2248896.1

34.     On June 23, 2015, Mr. Leary went to the Defendant's home for the specific purpose of transferring all knowledge, technology and software transfer from the Defendant to Mr. Leary as required under the provisions of the Defendant's Employment Agreement.

35.     Nevertheless, as documented in Mr. Leary's email communications with Mr. Jiang, as well as other discussions Mr. Jiang has had with Mr. Leary, Defendant failed to provide any significant knowledge transfer to iQuartic.  Copies of the *Leary Emails* are attached hereto as **Exhibit C**.

36.     During the meeting, Defendant informed Mr. Leary that he did not need to show up or do any work and that he would still get paid.  Mr. Leary also reported that during the meeting, Defendant spent the entire time on the phone on his personal business and instructed Mr. Leary to download, install and run software code that did not contribute at all in Mr. Leary's ability to run the Code Defendant development.

37.     The lack of knowledge transfer from the Defendant, coupled with iQuartic's existing design and sales deadlines, ultimately caused Mr. Leary to also resign from his position at iQuartic after working for only one week.

*Defendant's Resignation*

38.     On June 24, 2015, the Defendant attempted to coerce and even extort iQuartic to retain him as an independent contractor relationship under a proposed Master Service Agreement ("MSA"), by withholding his full cooperation and the Code from deployment for testing.  A copy of the *MSA* is attached hereto as **Exhibit D**.

39.     Defendant suggested that the MSA would allow him to continue developing the Code, despite his preexisting obligations to provide it for deployment and testing under his contractual agreements with the company.

11

40.     When Mr. Jiang informed the Defendant that he would not enter the MSA without Defendant's work product first being deployed and tested as previously requested, Defendant stormed off.

41.     Less than ten minutes later, at 5:07 P.M., the Defendant submitted a formal email notification to Mr. Jiang of his resignation from iQuartic as Director of Software Development effective that day (several days earlier than he had previously communicated). A copy of *Simms' 6/24/15 Resignation* is attached hereto as **Exhibit E**.

42.     In direct violation of the terms of Defendant's Employment Agreement and Confidentiality Agreement, he refused to submit to an exit interview and to surrender all proprietary and/or confidential information and company materials in his possession, custody and control belonging to iQuartic.

*Deciphering the Code*

43.     Following Defendant's resignation from iQuartic, the company had dedicated more than eighty (80) hours attempting to decipher the Defendant's purported work on the Code, excluding more than forty hours of Mr. Leary's work prior to his resignation.

44.     At present, iQuartic has two contract software development coders working full-time on the Code and they have still not been able to decipher and run the Code that the Defendant was paid to develop on iQuartic's behalf.

45.     The Defendant's failure to deliver the Code following repeated requests for validation and testing, after several months of development, has seriously jeopardized iQuartic's ability to meet its internal and delivery deadlines for the Project.

2248896.1

46.     iQuartic will be irreparably harmed in its relationship with BCBS, its customer prospects and the marketplace in general, unless the equitable relief prayed for in this application is granted.

### PROCEDURAL HISTORY

47.     On June 29, 2015, iQuartic sent the Defendant a demand letter via electronic and certified mail (the "Demand Letter").  A copy of the *6/29/15 Demand Letter* is attached hereto as **Exhibit F**.

48.     The email was directed by iQuartic's counsel to Simms' personal email address customarily used by him during his employment with iQuartic.  Undersigned counsel did not receive any electronic non-delivery notification and presumes the email was received by Simms.

49.     The Demand Letter was addressed to Defendant at his residential address of record and directed him to immediately produce of all of his personal computers, as well as all of his tablets or other personal devices, on July 2, 2015 for immediate review, copying and imaging by iQuartic's computer forensics firm, Elysium Digital, LLC ("Elysium") in order to verify that Defendant did not retain any Code or other proprietary, trade secret or confidential information belonging to iQuartic.

50.     The Demand Letter also indicated that the Defendant was to appear at the office of undersigned counsel to meet with Mr. Jiang for an exit interview as required in the Employment Agreement.

51.     According to the United States Postal Service ("USPS") online tracking system, on July 1, 2015 at 10:25 a.m., the USPS attempted to deliver the certified Demand Letter to Defendant's home address.  A copy of the *USPS Tracking Information* is attached hereto as

2248896.1

**Exhibit G**.  Because an authorized recipient was not available at the time, the USPS left a notice at Defendant's residence indicating that the letter could be picked up at the Post Office.

52.     The Defendant did not appear at Elysium's office the following day (July 2, 2015), as directed, to produce his personal devices.

53.     In an effort to perfect service, counsel for iQuartic re-served the Demand Letter on the Defendant at his home address with a constable service on July 2, 2015.  The constable attempted in-hand service on the Defendant at his last and usual place of abode on July 2, 2015 at 8:00 p.m. and again on July 3, 2015 at 7:30 p.m.  A copy of the *Return of Service* is attached hereto as **Exhibit H**.

54.     When there was no answer and no one appeared to be home, the constable left a copy of the Demand Letter at the Defendant's door and also sent another copy of the Demand Letter to the Defendant via first class mail that same day.

55.     The Defendant did not appear at undersigned counsel's office as requested on July 7, 2015 for his scheduled exit interview.

56.     The Defendant has since completely failed to correspond or communicate with iQuartic or its counsel on his duties and obligations under the Employment and Confidentiality Agreements.

57.     Nevertheless, on July 16, 2015, Defendant sent Mr. Jiang a series of email communications proving that he received the Demand Letter, and in them, he demanded final payment of all unpaid wages and claimed benefits.   Copies of *Simms' 7/16/15 Emails* are attached hereto as **Exhibit I**.

2248896.1

58.     Less than two hours later, Defendant even forwarded a copy of his online complaint filing with the Office of the Attorney General, Fair Labor Division, Commonwealth of Massachusetts, to Mr. Jiang.

59.     On July 18, 2015, Mr. Jiang responded that Defendant deliberately failed to keep two appointments at which he could have previously received payment of the unpaid wages and benefits, but that iQuartic was still demanding compliance with Simms' employment agreements with iQuartic. A copy of *Mr. Jiang's Email 7/18/15 Response* is attached hereto as **Exhibit J**.

60.     On Monday, July 20, 2015, Mr. Simms continued to refuse to acknowledge the details of his prior agreements and, instead attempted to continue to extort money from iQuartic, stating:

> You asked me to sign an "at will" employment agreement. I recommend you speak to a MA-based attorney who is knows MA employment law. They will explain to you the limits of such an agreement. You also have investors with HR experience you should leverage.
>
> Once all payments have been processed, you may re-open discussions of working on a contract or hourly basis.

A copy of *Simms' 7/20/15 Email* is attached hereto as **Exhibit K**.

61.     The following day, July 21, 2015, Defendant posted a notice on his website that he is moving from Massachusetts to Austin, Texas to begin a new job and will begin driving to Texas on Saturday July 25, 2015.   A copy of *Simms' Website Post* is attached hereto as **Exhibit L**.

**COUNT I**
**(Violation Of The Computer Fraud And Abuse Act 18 U.S.C. § 1030, et. seq.)**

62.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 61, above, as if fully set forth herein.

63.     iQuartic's computer systems are used in or affect interstate and foreign commerce, and are used to access the Internet. iQuartic's computer systems are a "protected computer" within the meaning of the Computer Fraud and Abuse Act ("CFAA").

64.     Defendant violated the CFAA, when they, knowing and intentionally, and to perpetrate a scheme to defraud , accessed 's network without authorization and/or in excess of his authorization, including but not limited to, when he took, without authorization, 's valuable and protected, proprietary, confidential, and trade secret information for his own benefit. Defendant violated the CFAA when he accessed iQuartic's network without authorization and/or in excess of his authorization, and took, without authorization, iQuartic's valuable and protected, proprietary, confidential, and trade secret information. By means of this conduct, Defendant furthered his intended fraud and obtained things of value.

65.     iQuartic has suffered damages and/or loss by reason of the Defendant's actions in violation of the CFAA.

66.     Pursuant to the CFAA, iQuartic is entitled to recover damages against the Defendant.

67.     iQuartic seeks recovery to the full extent permitted by the CFAA, including but not limited to, loss aggregating at least $5,000.00 in value, including the cost of responding to and investigating the source of the theft of information from iQuartic's computer network, and the cost of conducting a damage assessment.

2248896.1

68.     Pursuant to the CFAA, iQuartic is entitled to temporary and permanent injunctive relief enjoining the Defendant from making any further use of iQuartic's valuable and protected, proprietary, confidential, and trade secret information, and requiring the return of all such documents and things containing or embodying such information, including electronic and hard-copies of same.

WHEREFORE, iQuartic respectfully requests: (a) judgment in favor against the Defendant; (b) an award of damages, including pre-judgment and post-judgment interest resulting from the Defendant's actions; (c) entry of preliminary and permanent injunction requiring Defendant to return all documents and things containing or embodying the proprietary, confidential and trade secret information; (d) entry of a preliminary and permanent injunction enjoining the Defendant from making any further use iQuartic's proprietary, confidential, and trade secret information; and, (e) such further relief as this Court deems just and proper.

## COUNT II
### (Breach of Contract—Employment Agreement)

69.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 68 above as if fully set forth herein.

70.     In exchange for valuable consideration, the parties entered into binding contractual agreements, including an Employment Agreement.

71.     By virtue of the conduct alleged above, the Defendant has violated the applicable terms of his employment contract for the protection of iQuartic's business interests, including the protection of propriety, confidential and trade secret information.

72.     As a consequence of the foregoing, iQuartic has suffered and/or will continue to suffer substantial and egregious harm.

2248896.1

WHEREFORE, iQuartic demands judgment in its favor and against the Defendant on the claims set forth herein for specific performance of his contracts for the protection of iQuartic's business interests, and proprietary, confidential and trade secret information, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

## COUNT III
### (Breach of Contract—Confidentiality Agreement)

73.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 72 above as if fully set forth herein.

74.     In exchange for valuable consideration, the parties entered into binding contractual agreements, including iQuartic's Confidentiality, Non-Solicitation, Work for Hire and Non-Completion Agreement for the protection of business interests, including the protection of proprietary, confidential and trade secret information.

75.     By virtue of the conduct alleged above, the Defendant has violated the applicable terms of his contracts for the protection of iQuartic's business interests, including the protection of propriety, confidential and trade secret information.

76.     As a consequence of the foregoing, iQuartic has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, iQuartic demands judgment in its favor and against the Defendant the claims set forth herein for specific performance of the his contracts for the protection of iQuartic's business interests, and proprietary, confidential and trade secret information, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

18

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

77.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 15 above as if fully set forth herein.

78.     On or about October 2, 2014, iQuartic and Defendant entered into valid contracts.

79.     Pursuant to said contracts, iQuartic faithfully fulfilled its covenants and conditions.

80.     Defendant perpetrated material breach of said contracts by failing to tender his agreed-upon performance due under said contracts by knowingly failing to represent iQuartic's interests loyally, competently and diligently.

81.     Said breach is material.

82.     Said contracts include covenants of good faith and fair dealings.

83.     Defendant perpetuated material breach of the covenant of good faith and fair dealing by performing and engaging in the following acts (among others):

    a.  Failure to abide by the terms of the Employment Agreement and Confidentiality Agreement ("employment agreements") in order to deny iQuartic the benefit of its bargains under each;

    b.  Failure to appear at designated locations and times for participation in a contractually required exit interview and knowledge transfer discussions and to turn over all confidential information and company materials of iQuartic in his possession as required under the employment agreements, notwithstanding proper notice of same;

    c.  Defendant's efforts to extort an independent contractor hourly service agreement from iQuartic, by withholding his employee work product and cooperation as required under the employment agreements, in efforts to leverage such an agreement; and

    d.  Defendant's assertion that his at-will employment status negated his duties and responsibilities under the employment agreements with iQuartic, and justified his refusal to submit to the exit interview and to surrender all of his electronic devices containing confidential information, company materials,

and other proprietary and trade secret information as required by the employment agreements.

84.     As a direct and proximate cause of Defendant's breach, iQuartic incurred actual and general damages in the total sum to be determined at the time of trial, as well as special, incidental, consequential damages in the sum not yet determine.

WHEREFORE, the above-named Plaintiff demands a judgment against the Defendant in the amount of actual, general, special, incidental and consequential damages in the sum to be proven at trial; the amount of reasonable attorneys' fees if proper, expenses and disbursements of this action as well as other relief as this Honorable Court deems just and proper.

## COUNT V
### (Interference With Advantageous Relations And/Or Contractual Relations)

85.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 84 above as if fully set forth herein.

86.     At all times material to this claim, the Defendant knew or should have known of the existence and terms of the advantageous business relationships that iQuartic enjoyed with existing and prospective customers, and the actual contractual relationships that iQuartic enjoyed with its existing customers as described above.

87.     Despite such knowledge, the Defendant interfered with these advantageous business relationships and/or the existing contractual relationships between iQuartic and its existing and prospective customers, by engaging in the conduct described above.

88.     Such interference by the Defendant was intentional, malicious, without legal justification, and was conducted by unlawful method or means for such illegal purposes.

89.     As a result, iQuartic has suffered and will continue to suffer substantial and egregious harm.

2248896.1

WHEREFORE, iQuartic demands judgment in its favor and against the Defendant on the claims set forth herein, enjoining his unlawful conduct, and for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief, including injunctive relief, as this court shall deem just and appropriate.

## COUNT VI
### (Misappropriation of Proprietary, Confidential, and Trade Secret Information)

90.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 89 above as if fully set forth herein.

91.     By his actions, including those described above, the Defendant has wrongfully misappropriated, disclosed, and/or used certain of iQuartic's proprietary, confidential, and trade secret information.

92.     The misappropriation, copying, disclosure, sharing, use, dissemination, and/or destruction of such information by the Defendant constitutes an unauthorized copying, disclosure, or use of trade secrets and confidential information, in violation of Massachusetts Common Law and Mass. Gen. Laws c.93 § 42 *et seq*.

93.     iQuartic has and will suffer substantial, immediate and irreparable harm and damages, unless the Defendant is enjoined from disclosing and using such proprietary, confidential or trade secret information.

WHEREFORE, iQuartic demands judgment in its favor and against the Defendant on the claims set forth herein, as a result of his unlawful conduct for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, including injunctive and such further relief as this court shall deem just and appropriate.

2248896.1

<u>**COUNT VII**</u>
**(Violation of M.G.L. c.93A, § 11)**

94.     iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 28 above as if fully set forth herein.

95.     iQuartic is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c.93A, §§ 1 and 11.

96.     The Defendant is a "person" and engaged in "trade or commerce" within the meaning of M.G.L. c.93A §§ 1 and 11.

97.     The actions of the Defendant as set forth above, constitute willful and knowing violations of M.G.L. c.93A § 11.  His wrongful acts or practices include, without limitation, the following:  (a) misappropriating iQuartic's proprietary, confidential, and trade secret information and otherwise compromising its business reputation an goodwill; (b) tortiously interfering with iQuartic's contractual relationships with its current and former employee; (c) tortiously interfering with iQuartic's contractual and advantageous business relationships with its current and/or prospective customers; (d) engaging in unfair deceptive acts or practices in violation of the Federal Trade Commission Act 15 U.S.C. §§ 41-58, and Sections 2 and 11 of M.G.L. c.93A.

98.     As a result of the foregoing unlawful conduct, iQuartic has suffered and will continue to suffer substantial, egregious, and irreparable harm.

WHEREFORE, iQuartic demands judgment in its favor and against the Defendant on the claims set forth herein, as a result of his unlawful conduct, for any actual, consequential, and/or other damages, to the extent ascertainable, in an amount to be determined at trial, including double or treble damages, attorney's fees, and such other relief, including injunctive relief, as this court shall deem just and appropriate.

2248896.1

## COUNT VIII
### (Alternative Pleading--Fraud)

99.    iQuartic hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 above as if fully set forth herein.

100.    Defendant misrepresented to Plaintiff material facts pertaining to the facts and circumstances of Plaintiff's case, and details and scope of the software code development that Defendant would provide to iQuartic.

101.    Defendant knew that said misrepresentations were false.

102.    Defendant intended that iQuartic relied on said misrepresentations.

103.    iQuartic reasonably relied on Defendant's misrepresentations of material facts to its detriment.

104.    As a direct and proximate cause of Defendant's fraud, iQuartic has incurred actual and general damages in the total sum to be determined at the time of trial, as well as special, incidental, consequential damages in the sum not yet determine.

WHEREFORE, iQuartic respectfully requests a judgment against the Defendant: 1)  in the form of a permanent injunction as specified in its Application for Temporary Restraining Order and/or its Motion for Preliminary Injunction filed in connection herewith; 2) in the amount of actual, general, special, incidental and consequential damages in the amounts to be proven at trial; 3) the amount of its reasonable attorneys' fees, if proper, with respect to each claim; 4) all expenses, disbursements, and costs of this action, together with interest as allowed by law, and 5) any other relief as this Honorable Court deems just and proper.

2248896.1

Respectfully submitted,
iQUARTIC, INC.
By its attorneys:


//s// *William S. Rogers, Jr.*
William S. Rogers, Jr. (BBO# 549487)
wsrogers@princelobel.com
Julie B. Heinzelman (BBO #676497)
jheinzelman@princelobel.com
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(Tel):  617-456-8000
(Fax):  617-456-8100


Dated:  July 24, 2015